181 So. 100

**BUCK CREEK COTTON MILLS et al. v. STOKELY.**

**7 Div. 491.**

Supreme Court of Alabama.

April 14, 1938.

Rehearing Denied May 19, 1938.

L. H. Ellis, of Columbiana, and Lange, Simpson & Brantley and Reid B. Barnes, all of Birmingham, for appellants.

Benners, Burr, McKamy & Forman and Frontis H. Moore, all of Birmingham, for appellee.

**THOMAS, Justice.**

The several assignments of error are to the effect that there was error in the decree holding that appellee was entitled to specific performance of the contract set out in the bill and injunction, and for an accounting in equity.

The averments of the bill as to inducements of the contract, extension, and execution are as follows:

"Complainant further avers that following conferences with said respondents there was prepared, submitted to and approved by said respondents a written agreement, a copy of which is attached hereto and marked Exhibit 'C' and made a part hereof as if herein set out in full; that said contract was approved by the respondents and was submitted to and approved by all of the stockholders of respondent corporation at its annual meeting held on the 16th day of December 1930, and its execution and delivery was thereupon authorized by the Board of Directors of the respondent corporation.

"Complainant further avers that at the time of said approval, authorization and execution of said written agreement it was thoroughly understood and agreed between complainant and respondents that the Cannon stock purchased by the complainant had been purchased pursuant to the agreement between the parties as hereinabove set forth and as a part of the consideration for the execution of said agreement and with such understanding said agreement was executed between the parties and duplicate originals thereof delivered to the respective parties.

"Complainant further avers that said agreement of December 16th, 1930, was extended for an additional term of five years in accordance with the terms and conditions thereof.

"Complainant further avers that for the purpose of carrying out the agreement as in the immediately preceding paragraphs averred between complainant and respondents, and in order to insure the agreement made that complainant's interests should be regarded as a property right, coupled with the right of exclusive management as set out in the written contract, the by-laws of the respondent corporation were amended at the annual meeting on December 16th, 1930, so as to provide that the officers of the corporation should be a Managing Director, a President, a Secretary and Treasurer, and the duties of the Managing Director of the corporation as provided for by said by-laws should include the exclusive right of management of the company, leaving to the President no duties to perform except in the absence of the Managing Director or such duties as the President might be called upon to perform by the Managing Director.

"Complainant further avers that the purpose of these by-laws was to carry out in good faith the agreement of the parties and to assure to complainant, in consideration of his agreement to undertake the continued management of the company, the right to protect his property interest in the company as represented by the stock interest acquired for such purpose, and to protect his agreed compensation by committing exclusively to his management the making of profits upon which his investment and compensation solely depended. Complainant further avers that it was understood by the stockholders and directors of the company that complainant should be elected each year during the pendency of the management contract as Managing Director.

"Complainant further avers that pursuant to such agreement, understanding and by-laws, he was at such annual meeting elected Managing Director, Mrs. T. C. Thompson was elected President and J. T. Phillips on the suggestion of complainant was elected Treasurer, and that pursuant to the understanding complainant was re-elected as Managing Director each year thereafter until the meeting of February 8th, 1937, hereinafter more fully referred to."

The contract exhibited and aiding the bill (Grimsley v. First Ave. Coal & Lumber Co., 217 Ala. 159, 115 So. 90), among other things, contains the following averments:

"(1) That the party of the second part will continue the management of the business and affairs of the party of the first part as in the past, devoting such of his time as in his judgment may be necessary, and beginning with the current fiscal year, starting October 1, 1930, the party of the first part will pay to the party of the second part, as a management fee, an amount

equal to fifty per cent of the net profits, if any, of the company, in each fiscal year during the term of this agreement, after the payment of all operating expenses, insurance, taxes, (except income taxes), interest on indebtedness and depreciation, as shown by the books of the company, and as approved and allowed by the Bureau of Internal Revenue, and also after the deduction of an amount equal to six per cent on the net value of the company's properties, as shown by its books at the end of the preceeding fiscal year, such net value for the fiscal year ending September 30, 1930, being $239,604.39. The management fee herein provided for shall be paid from time to time during each fiscal year and at the end thereof, as the net profits and the condition of the Company may justify.

"(3) If under the management of the party of the second part the Company shall earn no net profits for two consecutive years, then in that event either party may terminate this agreement.

"(4) Unless sooner terminated, as hereinabove provided, or by the death of the party of the second part, this agreement shall continue in force and effect for a period of five years beginning October 1, 1930, and at the expiration of said five year period, at the option of the party of the second part, shall be extended on the same terms and conditions for an additional period of five years."

The management averred as contracted for, and that done and accomplished by complainant resulted in a liquidation of large indebtedness out of profits that accrued from complainant's management.

The many grounds of demurrer assigned were overruled.

It should be stated that the bill avers that at the time of the authorization and execution of the contract, it was agreed between complainant and respondents that the Cannon stock (from the holders of a large block of holders thereof) was making insistence of bankruptcy and that complainant should purchase the same. This was done pursuant to the agreement between the parties, and was a part of the consideration for the execution of said agreement and understanding of December 16, 1930, entered into between the parties, which contract was evidenced by duplicate originals delivered to the respective parties. It is further averred and shown that the agreement of December 16, 1930, was subject to extension for five years by its own terms and that it was duly extended for an additional term of five years in accordance to its terms and the agreement of the parties.

The bill further avers that for the purpose of carrying out the agreement between complainant and respondents, and in order to insure the agreement that complainant's interest should be regarded as a property right, coupled with the right of exclusive management, by-laws of respondent corporation were amended at the annual meeting on December 16, 1930, so as to provide that the officers of the corporation should be a managing director, a president, secretary and treasurer, and that the duties of the managing director as provided in said by-laws should include the exclusive right of management of the company, leaving the president nominal duties.

It is averred that the purpose of these by-laws was to carry out in good faith the agreement of the parties and to assure to complainant in consideration of his agreement to undertake the continued management of the company, the right to protect his property interest in the company as represented by the stock interest acquired for such purpose, and to protect his agreed compensation by committing exclusively to his management the making of profits upon which his investment and compensation solely depended. It is further averred that it was understood between the stockholders and directors of the company that complainant should be elected each year during the pendency of the management contract as managing director, and that pursuant to such agreement, understanding, and by-laws, he was at such annual meeting elected managing director, Mrs. T. C. Thompson, president, and J. T. Phillips, treasurer, and pursuant to such understanding, complainant was re-elected as managing director each year until the meeting of February 8, 1937, hereinafter referred to.

The bill further avers that pursuant to said agreement and written contract, immediately following his election as managing director, complainant continued to manage exclusively the affairs of respondent corporation and did manage such affairs, devoting thereto his best efforts, time, ability, and attention, until the 8th day of February, 1937, at which time, it is averred, respondents wrongfully and illegally attempted to exclude him from the

management of the respondent corporation.

It is further averred that during such period the entire management of the mill was left to complainant as managing director to such extent that Mrs. T. C. Thompson, who had been elected as president, requested to be relieved, and resigned as president and director, and the business continued to operate with no officers except the managing director and secretary and treasurer, who acted altogether under the supervision of complainant as managing director. While in form the operation of the company continued as a corporation, it was in fact and substance, as it was intended to be by the agreement between complainant and respondents, the operation of a joint venture under the exclusive management of complainant, for the benefit of the Thompson family and complainant, and the few other stockholders, with the end in view of relieving the corporation of its indebtedness, placing it on a business basis, retiring its indebtedness, and eventually re-establishing the value of its stock.

It is further averred that from the time complainant took charge of the affairs of the respondent company, about the 1st of March, 1930, he continued in the exclusive management without any interference on the part of respondents, but with their full approval and co-operation, devoting the major portion of his time to such duties as the managing director, and sacrificing to a considerable extent his business as an attorney until respondents illegally and wrongfully attempted to interfere with his management.

The bill then sets out the fact that under the management of complainant, all the creditors as of March 31, 1930, had been paid off by February 1, 1931, except the six largest, to whom there was a total indebtedness of $349,708.16, with approximately $10,000 accrued interest; that complainant after considerable negotiations reached an agreement with the First National Bank of Birmingham, Commercial Factors Corporation, and W. E. Walker for the issuance by respondent company of $230,000 of its five-year sinking fund bonds; that these were issued on June 1, 1931, and $125,000 par value were delivered to the First National Bank of Birmingham in payment of an equal amount of its unsecured notes, the balance being paid in cash; $93,000 in par value of bonds were delivered to Commercial Factors Corporation in payment of an equal amount of unsecured notes, the balance of the indebtedness being paid in cash; and $12,000 par value of bonds were delivered to W. E. Walker in payment of an equal amount of his indebtedness, unsecured notes being issued for the balance due him. The account of the Alabama Power Company and the notes of the Stafford Company were likewise liquidated on a monthly basis, and the obligation to the Bankers Mortgage & Bond Company paid and discharged in due course; that the last of all of the outstanding bonds were paid on December 1, 1936, thereby completing the payment of the indebtedness and obligations of the company outstanding on March 31, 1930. It is averred that the management of the company by complainant resulted in a profit each fiscal year, even during the depth of the depression, and that in addition to the payment of the company's obligations outstanding on March 31, 1930, there had been expended approximately $132,000 for additional machinery and equipment, and for the betterment of its products and the greater efficiency, health, and comfort of its employees.

The bill further avers that the audit reports made by the firm of Davis & Muddiman were furnished to the banks with which respondent company did business, the trustee under its bond issue, commercial agencies, and some of the largest creditors. The audit reports furnished the basis of respondent company's federal and state income tax returns, and showed the compensation due complainant under the agreement of December 16, 1930, Exhibit C, which had been paid from time to time in accordance with the terms of the agreement. The audit report for the month of September, 1936, showed a balance due complainant at that time of $20,103.70, subject to the final determination of said income taxes claimed by the United States and the state of Alabama.

Then followed averments as to change in the firm of auditors, the subsequent statement of one of the new auditors to some of the stockholders that the profits were exaggerated in complainant's reports to increase his compensation, that he had overdrawn his accounts in substantial amounts, which statements are averred to have been false and untrue and without a basis of fact; that complainant continually urged the said Miller to finish

the statement for the fiscal year ending September 30, 1936, so that the annual meeting of the stockholders which had been delayed by his failure to complete the audit could be held; that a meeting of the stockholders was held on February 8, 1937, and that when complainant appeared for this meeting, the respondent Mrs. E. T. Weller was present with her attorneys, refused to elect complainant to the board of directors, but used her stock in respondent company, which was a majority of the stock represented at the meeting, to replace complainant and A. D. Smith as directors with respondent Mrs. T. C. Thompson and J. T. Phillips; that prior to the date of this meeting, complainant had no knowledge or notice of the statements made by the said Miller to respondent Mrs. Weller, or of any dissatisfaction on her part with his operation of the company; that he protested that the statements of Miller to her could not be true; otherwise the indebtedness of the company could not have been paid nor the expenditures made in the improvement of the plant; that he was asked for no explanation and given no opportunity for an explanation, but was subjected to the most insulting abuse and was accused by said Mrs. Weller of having corrupted Mr. Muddiman to show excessive profits in his reports in order to increase complainant's compensation; no figures were produced at the meeting to support the statements made by the said Miller to Mrs. Weller, and complainant requested that no action be taken and the meeting be postponed for a month until the facts could be determined, but this request was denied and a similar request that the meeting be postponed for a week was made, but that Mrs. Weller refused to agree to the postponement even for a single day, but took precipitate action and indulged in the outburst without any regard for complainant's rights in the premises; that it was agreed in this meeting that as soon as Miller should have completed his figures, he and Mr. Muddiman should get together in an effort to reconcile the differences between them, but notwithstanding this agreement, "Miller, after stalling along for months, bleeding the company in the meantime, issued a report which it is averred shows an obvious effort on his part to bolster up the false statements which he had made to Mrs. Weller by making a simulated charge against complainant without basis of fact, and

which the records of respondent company showed to be without basis of fact; that this report attempts to charge throughout the period of the agreement unwarranted depreciation in large amounts impossible to sustain, indulged in unwarranted presumptions, and made other false and simulated charges in an effort to reduce respondent company's net profits, thereby reducing complainant's compensation."

It is further averred that at the stockholders' meeting on February 8, 1937, complainant protested against any interference with his right of management and stated that it was his purpose in good faith to continue therein, and the complainant avers that he has been at all times ready and able, and is now ready and able, to continue management of respondent corporation and perform the duties and obligations imposed upon him by his agreement with respondents.

The bill further avers that notwithstanding such protest against interference on the part of respondents with complainant's management of respondent corporation, respondents wrongfully and illegally have interfered with complainant in the performance of his contract, and the protection of his property interest, and have changed the status that existed under complainant's contract and the execution thereof by obstructing complainant's access to the office and papers of the corporation, and caused employees of the corporation who are subject to the dominant control of the individual respondents, to decline to further recognize his authority, and have in writing advised complainant that his agreement is no longer effective and will not be further recognized, and have further changed the status quo that existed to make the performance of complainant's contract impossible, thereby causing complainant irreparable loss and injury unless restrained by the court from further interference and unless ordered by the court to restore the status of respondent corporation and its management to its former condition existing prior to the commission by respondents of said unlawful acts.

It is further averred upon information and belief that since the unlawful interference by the individual respondents of complainant's management of respondent corporation, said respondents intend to have the operations conducted by them; that the respondent Mrs. Weller is without business experience and is incompetent to

have supervision of the business; that Mrs. T. C. Thompson, under whose supervision and direction the business was brought from a safe and successful financial condition to the brink of bankruptcy, is incompetent to handle or supervise any part of the business; that H. S. Miller, upon whose false statements respondents relied and in whose hands have been placed important matters of taxation, is not only disqualified from practicing before the federal tax board, but bears the reputation of being dishonest, unreliable, and a trouble-maker and is inefficient and unfitted to perform the duties intrusted to him; that if the business is conducted by the individual respondents as proposed, there is grave danger of complainant as well as respondents suffering great and irreparable loss.

The bill further avers upon information and belief that the acts of respondent are fraudulent in purpose and effect against complainant, constitute fraud, and unless restrained will result in irreparable damage and loss to him; that the fraud consists, among other things, of the following: (a) The fraudulent conduct and purpose of the auditor Miller in making a fraudulent and dishonest audit of the books, in delaying the audit of such books from the fall of 1936 until the summer of 1937; (b) the acceptance by respondents without inquiry, investigation, or corroboration of the reckless and false statements of Miller, resulting in the attempted breaking of complainant's contract, and their failure to have the charges investigated, and their action in wrongfully and illegally attempting to cancel complainant's contract and interfere with his management. It is averred that this fraud has been largely occasioned by reason of the profitable conduct of the company and the expected greatly increased profits during the three-year unexpired period of complainant's contract; that complainant, whose devotion to the joint enterprise and his efficient management through the years of depression having been able to save the corporation, pay its debts, improve its plant, and re-establish its credit, by the fraud of respondents is sought to be deprived of the large profits which he can reasonably expect to make during the unexpired period of his contract.

It is further averred that unless a court of equity restrains repondents from carrying out their interference with complainant's management and restrains them from proceeding with their threatened inefficient management and conduct of the affairs of the corporation, complainant will suffer great and irreparable loss and be without any adequate remedy at law because, among other things: (a) He will be deprived of his property rights guaranteed him under his agreements and contracts with respondents of securing the earned reward incident to his demonstrated efficiency in carrying out the provisions of his agreements and contract; (b) he will be deprived of the measuring rod agreed upon by respondents in said agreements and contracts as the measure of his compensation for services rendered, and will be compelled to take the risk through inefficiency in respondent's management of having such management substituted as the measuring rod of his compensation, although the agreements contemplated that complainant's compensation be measured by his own industry, honesty, ability, and efficiency; (c) that by reason of the inefficiency of the threatened management of the company by the individual respondents as demonstrated by results of their previous management, there is grave and apparent danger of complainant's interest becoming worthless, or greatly depreciated, and complainant's compensation as provided becoming of little or diminished value; (d) that if the present threatened management is allowed to take place and continue, there is grave danger of the company again becoming insolvent and the stock again becoming worthless; (e) that on account of the facts and conditions set out, it is impossible for the complainant, excluded from the management of the company, for any measure of damages to be applied by a court of law; (f) that complainant, relying and having confidence in the carrying out in good faith of his agreement with respondents, stands the risk of losing without compensatory benefits his investment in the corporation and the additional income he could have derived from the practice of his profession except for the time and efforts he devoted to the affairs of the respondent corporation in saving it from bankruptcy and re-establishing it as a successful enterprise.

The bill further avers that because respondents have attempted arbitrarily and wrongfully to cancel the agreements and contracts and have served notice upon complainant that complainant instead of having, as shown by the audit of Miller, Davis

& Muddiman as of September 30, 1936, the sum of approximately $20,000 due him, which amount it is averred has been greatly increased since such date, the report of Miller shows that he has overdrawn his account with the respondent company and is indebted to it in the sum of $84,000, and on account of the complicated accounts, the difference of opinion between the auditors, the proper determination of complicated items of depreciation, and other items which reflect on the ascertainment of net profits, the necessity for discovery of matters in the management of the company which are peculiarly within the knowledge of the respondents, the fiduciary and trust relationship which has existed between complainant and the respondents for the past seven years, and the fraud and wrong that has been committed upon the complainant by the respondents and the fact that adequate relief cannot be obtained in a court of law, and because the duty rests on respondents to render an accounting, which duty will continue to exist during the unexpired portion of complainant's agreement, it is necessary for an accounting to be rendered by respondents in a court of equity in order that the account should be stated by a trained master or accountant rather than by a common law jury or court, and that therefore, irrespective of the relief prayed for by injunction and specific performance, it is necessary in the interests of justice that a court of equity take jurisdiction of the differences between the complainant and the respondents by reference to this complicated affair and cause respondents to render a just accounting to complainant relating to the seven-year period during which he served as manager of respondent corporation, and such time as he may hereafter serve as manager.

The bill further avers that complainant will suffer irreparable injury and damage unless respondents are enjoined from interfering with complainant's management, and that it is necessary for the protection of complainant's rights and to save him from irreparable loss and damage that respondents be enjoined from interfering with him in his management of the business.

The bill prays for an injunction enjoining respondents from interfering with and excluding complainant from the performance of his duties; that respondents be required to restore complainant to his status which existed prior to September 7, 1937; that respondents be ordered to allow complainant to resume or continue his management under the terms of his agreement; and that respondents be restrained from conducting the business of the corporation. The bill likewise prays for a discovery and an accounting.

The law of such a case is well understood. A contract of agency coupled with a material interest, or such a time limit as comes within the exceptions to the general rule, is not subject to revocation by one of the parties or by the act of the principal alone, unless by the express provision of the contract the power remains revocable. This is the general rule of 2 Corpus Juris § 75, p. 1159; 2 Corpus Juris §§ 154, 155, p. 531, note 59.

In Chambers v. Seay, 73 Ala. 372, it is said: "It is a generally admitted proposition of law, that a principal is not permitted to revoke the authority of his agent, where such authority is coupled with an interest, or where it is necessary to effectuate a security.—Ewell's Evans on Agency; marg. page 83. These are the two established exceptions, which seem, indeed, to be essentially similar in principle. It is contended that the agency of the plaintiff, Chambers, comes within the influence of the first exception, as being coupled with an interest, and it was not competent, therefore, for Seay to revoke it. It is not any interest, however, that will suffice to render an agency irrevocable. An interest in the proceeds of sale, or money derived from the sale of property by an agent is not sufficient for this purpose.—Barr v. Schroeder, 32 Cal. 609; Hartley's Appeal, 53 Pa. 212, 91 Am.Dec. 207; Gilbert v. Holmes, 64 Ill. [548], 549. To be irrevocable, it seems now well settled, that the power conferred must create an interest in the thing itself or in the property which is the subject of the power. In other words, 'the power and estate must be united and co-existent,' and, possibly, of such a nature that the power would survive the principal in the event of the latter's death, so as to be capable of execution in the name of the agent.—Blackstone v. Buttermore, 53 Pa. 266; Bonney v. Smith, 17 Ill. 531; Mansfield v. Mansfield, 6 Conn. 559, 16 Am.Dec. 76; Hunt v. Rousmanier, 8 Wheat. 174, 5 L.Ed. 589; Evans on Agency (Ewell), marg. page 83, note, and p. 85; Raleigh v. Atkinson, 6 Mees. & W. 670. In Hunt v. Rousmanier, supra,

such a power was defined by Chief Justice Marshall to be one 'engrafted on an estate in the thing itself.' "

See, also, Blount County Bank v. Brice, 209 Ala. 670, 96 So. 769; Gulf Trading Co. v. Radcliff, 216 Ala. 645, 114 So. 308; 21 R.C.L. 889, § 62; Hunt v. Rousmanier, 8 Wheat. 174, 5 L.Ed. 589.

■ The breach of such a contract of agency (one coupled with an interest) may be enjoined, if under the facts that remedy is warranted, whether such a contract can or cannot be enforced. Blount County Bank v. Brice, supra; Cooper v. Cooper, 206 Ala. 519, 91 So. 82; Edmundson-Randle Drug Co. v. Partin Mfg. Co., 200 Ala. 208, 75 So. 966; Lane Mortgage Co. v. Crenshaw, 93 Cal.App. 411, 269 P. 672, 680.

■ The general authorities that are applicable to such contract, accounting thereunder, specific performance, or injunction against the breach thereof, are well understood and discussed in the authorities cited, notably the case of Lane Mortgage Co. v. Crenshaw, supra, and in a decision by this court in Edmundson-Randle Drug Co. v. Partin Mfg. Co. et al., supra. In the last-cited case, Mr. Justice Somerville quotes from Pomeroy as follows, " 'Where one person agrees to render personal services to another, which require and presuppose a special knowledge, skill, and ability in the employe, so that, in case of default, the same services could not easily be obtained from others, although the affirmative specific performance of the contract is beyond the power of the court, its performance will be negatively enforced by enjoining its breach.' Pom. Spec. Perf. (2d Ed.) § 24," and his observation here pertinent is as follows:

"This assumes, of course, that the threatened breach will result in injury to the complainant, for the redress of which his legal remedies are inadequate.

"We think the allegations of the bill make a case for complainant within the operation of this principle. 22 Cyc. 844, C; 5 Pom. Eq. Jur. (3d Ed.) § 296; Iron Age Pub. Co. v. W. U. T. Co., 83 Ala. 498, 3 So. 449, 3 Am.St.Rep. 758."

This is in line with the general authorities that are collected from many jurisdictions in 2 C.J. p. 1159, § 75, where it is stated: "Although a contract not to revoke an agency only abridges the right of the principal to revoke, as has been noted in § 74, and not his power to revoke, as has been stated in § 73, yet where the authority given the agent is supplemented with an interest or estate in the subject matter of the agency itself, the rule is well established both at common law and by statute that both the right and the power to revoke the agency without the agent's consent is taken away; and a purported revocation can have no effect unless by express provision the power remains revocable. Such a power is from its nature irrevocable, whether or not expressed to be so, but the fact that it is expressed to be irrevocable has been held to be some evidence that the parties understood the agent to have an interest in the subject matter of the agency."

The essential elements are stated from many jurisdictions in 2 Corpus Juris p. 532, § 155. The notes to the foregoing citation in Corpus Juris contain many cases from the United States Supreme Court, from many state courts, and from the English courts. The rule is founded on a reasonable construction of contracts, coupled with a financial interest in the subject matter, and not merely an interest in the proceeds or product, operation, or usufruct.

Adverting by way of illustration, to some of the cases cited by appellant it will be noted that in the case of Iron Age Pub. Co. v. Western Union Tel. Co., 83 Ala. 498, 3 So. 449, 3 Am.St.Rep. 758, the contract sought to be enjoined in the breach was for a personal service, of an indefinite period of time, and of a continuous nature. Tombigbee Valley Ry. Co., v. Fairford Lumber Co., 155 Ala. 575, 47 So. 88. In the case of Electric Lighting Co. et al. v. Mobile & Spring Hill Ry. Co., 109 Ala. 190, 19 So. 721, 55 Am.St.Rep. 927, the contract was for the furnishing and keeping machinery in repair to furnish electric power and to perform the service over a long period, and required supervision of the contract by the court. Injunction was denied as to the alleged threatened breach of the contract, and it was held that complainant had adequate remedy at law. Roquemore & Hall v. Mitchell Bros., 167 Ala. 475, 52 So. 423, 140 Am.St.Rep. 52. The last-cited case was where the court considered a contract for personal service to load gravel.

The foregoing will illustrate this point. In the cases cited by appellant, as we understand, are exceptions to the rule that specific performance cannot be had of

contract of employment or personal service.

The case we have for decision is (1) that of an agency created and coupled with an interest, not revocable; (2) unwarranted interference by the opposite party with the agent's performance of his agency; (3) that the contract exhibited as a part of the pleading created a power coupled with an interest; and (4) that its unwarranted breach would result in irreparable injury for which complainant had no adequate remedy at law.

In the case of Lane Mortgage Co. v. Crenshaw, supra, the court answered the whole insistence by saying: "Respondents' contention that injunction does not lie is based chiefly on the assumption that the agency is not a power coupled with an interest. If the contrary is conceded in conformity with the holding heretofore, little is left of respondents' theory on this branch of the case."

The appellee well said that "while Judge Stokely acquired a power coupled with an interest through Mrs. Thompson, the President of the corporation and its principal and dominant stockholder, the bill shows that the act was ratified and approved by all the Directors and stockholders, and it has been fully executed through the term of the original contract and a substantial part of the extension. Moreover, the power given to appellee, although coupled with an interest, was the management of the business and there is nothing in the bill to show that the corporation abrogated or abandoned its corporate powers. So far as the bill shows, the corporation annually held corporate meetings, made tax returns, fixed salaries, determined the corporate policies and exercised its corporate powers. * * * If * * * the failure at any time to have three Directors resulted in the dissolution of the corporation, then clearly the business was a joint venture and appellee's power coupled with an interest as to it is not to be disturbed. However, clearly there were three or more Directors at the time the entire contract creating the power coupled with an interest was entered into."

Where the bill shows a complicated state of facts in the accounts as to render necessary a proper accounting in equity, it should be submitted to the register, or a master of the nomination of the court, to ascertain and report the respective interests that are disclosed by a due accounting.

Julian v. Woolbert, 202 Ala. 530, 81 So. 32; Comer v. Birmingham News Co., 218 Ala. 360, 118 So. 806; Dewberry v. Bank of Standing Rock, 227 Ala. 484, 150 So. 463; Marx v. Marx, 226 Ala. 684, 148 So. 418.

In City of Mobile v. McCown Oil Co., 226 Ala. 688, 148 So. 402, 404, it is said: "That a court of equity will take jurisdiction in such cases, if the facts create a reasonable doubt as to whether adequate relief might be obtained at law. Comer v. Birmingham News Co., supra; Chrichton v. Hayles, 176 Ala. 223, 57 So. 696; Ingram v. People's Finance & Thrift Co., supra [226 Ala. 317, 146 So. 822]."

We have carefully considered the averments of fact and the bill states a case of equitable relief for accounting. Complainant was without an adequate remedy at law and injunction was a proper relief as prayed for to protect the agency coupled with an interest in the subject matter.

There was no reversible error in overruling respondents' demurrers and the judgment of the lower court is affirmed.

Affirmed.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.